STATE

v.

Sidney CLARK.

No. 97–104–C.A.

Supreme Court of Rhode Island.

May 18, 2000.

Aaron L. Weisman, Providence, for plaintiff.

Barbara Hurst, Paula Rosin, Providence, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case came before the Court on an appeal by Sidney Clark (defendant) from a judgment of conviction entered in the Superior Court on a charge of possession of a stolen motor vehicle pursuant to G.L.1956 § 31–9–2. The defendant also appeals an enhanced sentence he received as an habitual criminal pursuant to G.L.1956 § 12–19–21. The defendant was sentenced on July 11, 1996, to five years of incarceration for possession of a stolen motor vehicle and to twenty-five years enhanced incarceration as an habitual criminal (fifteen years to serve and ten years suspended with a probationary period following his release). We affirm the judgment of conviction and the enhanced sentence. The facts of the case insofar as pertinent to this appeal are as follows.

On August 27, 1994, Patrolman Anibal Baez, Jr., of the Providence Police Depart-

ment stopped a black 1995 model Dodge Neon automobile because the windshield was damaged. The driver, Gregory DiPina (DiPina), said that the automobile was owned by his aunt. The patrolman permitted DiPina to drive the automobile based on his promise that he would take it directly to his home and park it. Approximately five and one-half hours later, the patrolman noticed the same vehicle being driven on Waverly Street in Providence and pulled it over for a further encounter. It further appeared to the patrolman that the temporary license plates on the car may have been altered. Although a check of the vehicle's VIN number did not indicate that it was stolen, the patrolman requested a license, registration, and proof of insurance. DiPina could not produce any of these documents. The patrolman issued a summons to DiPina for driving without a license and driving with an expired registration. The car was towed for safekeeping and DiPina was released. He never sought to reclaim the automobile.

In early September 1994, an automobile dealership in Raynham, Massachusetts, Silver City, Inc. (Silver City), reported that a new 1995 model black Dodge Neon had been stolen from its new car lot between August 1 and August 15, 1994, probably during business hours. Investigation indicated that defendant had been employed by Silver City as a sales representative from May 2, 1994, until August 19, 1994, when he was laid off for failing to sell a sufficient number of cars. During the period of his employment, defendant had access to the new cars in the lot, which was highly secured from members of the general public.

At the time of his encounter with Patrolman Baez, DiPina had been on probation incident to a fourteen-year suspended sentence for a charge of possession of heroin. This sentence had been imposed in November 1992.

After the Providence police found out that the 1995 black Dodge Neon had been stolen, charges were brought against DiPi-na for possession of a stolen motor vehicle and for violation of his probation on the fourteen-year suspended sentence. He was held, for want of bail, at the Adult Correctional Institutions (ACI) pending a violation hearing.

During a discussion between DiPina and his attorney, Thomas A. Hanley (Hanley), DiPina asserted that he had purchased the automobile from a person named "Sidney" for $3,000 plus a quantity of cocaine. Hanley did some research that disclosed that Sidney's last name was Clark. Sidney Clark was well known to the Department of the Attorney General because he was convicted of murdering another inmate at the ACI in 1975 and had been sentenced to death. Thereafter, the Rhode Island death penalty was declared constitutionally invalid and defendant was resentenced to life imprisonment, from which he was paroled in 1993 over the objection of the Department of the Attorney General. Hanley communicated with representatives of the Attorney General to determine if Sidney Clark was the same Sidney Clark whom he knew through reputation.

DiPina was then released from the ACI without having undergone a violation hearing. He was invited to appear at state police headquarters in order to give a statement about his alleged purchase of the Dodge Neon from defendant. He gave a statement to the state police outlining the facts incident to the purchase on April 13, 1995. During that same meeting, DiPina was shown a six-photograph array from which he selected a photograph of defendant as the person who had sold him the car.

Following the meeting with the state police, Hanley and Special Assistant Attorney General Ronald Gendron (Gendron) had discussions in the courthouse about the state's willingness to be of assistance to DiPina if he cooperated with the prosecution of defendant on the stolen-motor-vehicle charge. After one of these discussions, Gendron presented to Hanley a

four-page memorandum of agreement that offered DiPina a disposition of less than jail on both the charges of possession of the stolen vehicle and violation of probation if he carried out an agreement to testify truthfully in respect to the charges that would be brought against defendant. DiPina never saw this document because he broke off contact with his attorney after his release from the ACI. Hanley placed the proposed agreement in his file.

On or about September 8, 1995, DiPina again was arrested on an unrelated charge for possession of heroin. He again was held without bail as an alleged violator of his 1992 suspended sentence. He again was represented by Hanley. He went before a justice of the Superior Court and pleaded *nolo contendere* to the stolen-motor-vehicle charge and the heroin charge. The justice imposed concurrent sentences of five years on both charges, with three years to serve and two years suspended. The fourteen-year suspended sentence was left without revocation.

DiPina was confined from September 8, 1995, until December 18, 1995, at the Intake Center of the ACI. While he was there, he encountered a group of maximum security inmates who were temporarily housed at the Intake Center because of a riot at the maximum security center. Some of these inmates suggested that they knew defendant, who had been incarcerated there since February 1995 on a charge of unlawful possession of a weapon. The defendant was later acquitted of this charge. These inmates suggested that DiPina should exonerate defendant. For a time, DiPina and defendant were both at the ACI. On November 15, 1995, DiPina wrote to an attorney who he believed was representing defendant, and offered to testify that defendant did not sell him the stolen automobile. DiPina was contacted by an attorney from the office of the public defender, who was actually representing defendant. Ronald Manchester (Manchester), an investigator from that office, obtained an affidavit from DiPina, which stated as follows:

"Sometime, in June or July of 1994 I purchased a 1995 Dodge Neon, black from a person who said his name was 'Sidney Clark.' I told this to the police, but I have since met the real, Sidney Clark, and he is not the man that had sold me the vehicle in June or July of 1994."

This affidavit was dated November 20, 1995. DiPina had been incarcerated from April 22, 1994, until July 21, 1994, as stipulated by the parties.

On December 18, 1995, DiPina was transferred from the Intake Center to the maximum security facility at the ACI, where he remained until January 25, 1996. While he was in maximum security, DiPina had a brief conversation or two with defendant. According to DiPina's later testimony, defendant suggested that since DiPina had already been sentenced for possession of the stolen vehicle it would be best for him to "take the weight" for this charge and to assert that DiPina had gone to the Silver City automobile dealership himself and taken this automobile out of the new car lot. As a result of this conversation, defendant obtained from DiPina a copy of the affidavit given to Manchester on November 20, 1995.

On January 19, 1996, Manchester went to the ACI to meet again with DiPina. Following that visit, Manchester took a new affidavit from DiPina in the form of seventeen questions and answers, dated February 28, 1996. In this affidavit, DiPina stated that he stole the vehicle in question from the Silver City Dodge premises, where the automobile was kept with the keys in the ignition. He stated that his earlier statement to the state police about purchasing the car from Sidney Clark was false, but that the current statement was the truth. The substance of the information contained in the affidavit had been stated orally to Assistant Public Defender John Hardiman.

Consequently, on the eve of trial it appeared that DiPina would serve as a witness for the defense. However, when the trial commenced, he testified for the prosecution. Furthermore, between the time of DiPina's sentence in Superior Court (on the automobile and the heroin charges) and the commencement of defendant's trial, DiPina had filed a motion to reduce his sentence.

In support of his appeal, defendant, through his attorney, the public defender, has raised five issues. These issues will be considered in the order in which they appear in the public defender's brief.

In addition, defendant has filed a brief, *pro se*, which raises three issues together with a number of sub-issues. The issues raised by defendant *pro se* will be discussed after those issues raised by the public defender on his behalf. Further facts will be provided as may be required to discuss the issues raised by defendant.

## I

Did the State Violate the Principles Set Forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by Failing to Disclose a Promise by the State to Release DiPina From Incarceration Following the Conviction of Sidney Clark Through Supporting DiPina's Request for a Sentence Reduction?

It is undisputed that five days after the conviction of Sidney Clark in Superior Court, DiPina appeared before another justice of that court, who reduced DiPina's concurrent sentences for the stolen-motor-vehicle charge and the heroin offense to nine months to serve. This reduction caused DiPina to be eligible for immediate release from the ACI because he had already served approximately nine months of his concurrent sentences of three years to serve. At the beginning of and during defendant's trial, both the prosecutor and Hanley asserted that DiPina's release on December 14, 1994, on bail after being held on the stolen-motor-vehicle charge and as a probation violator, was a quid pro quo for his cooperation against defendant. It further appears that the state's memorandum of agreement, which had never been executed, was not kept secret from the defense. Counsel for defendant cross-examined DiPina extensively concerning the motion to reduce sentence and the fact that DiPina anticipated consideration on his motion to reduce if he testified for the prosecution against defendant on the stolen-motor-vehicle charge. DiPina was somewhat in doubt about the expectation, but considerable discussion was carried out on cross-examination about a possible eighteen-month reduction in his sentence. The jury was fully informed about the unexecuted memorandum of agreement in which the state had set forth its willingness to achieve a result of less than jail in exchange for his testimony in favor of the prosecution.

■ At the outset it is important to note that defendant failed to raise this issue in Superior Court and is, therefore, presenting it to this Court for the first time on appeal. We have said in *State v. Tempest*, 651 A.2d 1198, 1216 (R.I.1995), that we shall not consider on appeal issues that were not presented to the trial justice for his or her determination. This principle is applicable to the element of fact finding, which is peculiarly the province of the trial court. The "raise-or-waive" doctrine has been often expounded by this Court. *See, e.g., State v. Bettencourt*, 723 A.2d 1101 (R.I.1999) and cases cited therein.

The evidence in this case discloses the very type of situation in which fact finding may be required. There is no question that the jury, during the course of defendant's trial, was made aware of a good deal of information concerning negotiations between the state and DiPina about his proposed testimony on behalf of the prosecution. No specific fact had been found nor has it been found to the present relating to promises made to DiPina to reduce his three-year period of incarceration, al-

though it is quite apparent from the cross-examination that DiPina entertained a well-founded expectation that his sentence would be reduced to some extent in consideration of his testimony on behalf of the prosecution in the event that defendant was convicted.

■ Consequently, this issue is not ripe for our consideration until such time as a postconviction application may result in fact finding by the Superior Court on this highly disputed issue wherein evidence may be presented by both sides concerning the extent of disclosure of this anticipated benefit.[1] We decline to consider the issue in this context.

## II

Did the Trial Justice Err in Declining to Give a Requested Instruction with Respect to the Substantive Admissibility of Evidence of Prior Inconsistent Statements Pursuant to Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence?

There is no question that Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence provides that a prior inconsistent statement may be used as substantive evidence of the matters asserted therein. This Court held in *State v. Pusyka*, 592 A.2d 850, 854 (R.I.1991), that because of the existence of this rule, it was error for a trial justice to instruct the jury to limit its consideration of a prior inconsistent statement to the assessment of the credibility of the declarant. However, in the case at bar, there is no claim or indication that the trial justice in any way limited the jury in its use of DiPina's prior inconsistent statements. Indeed, the trial justice instructed the jury that it could consider all testimony presented by any witness, and admon-

ished the jurors that "[y]our discretion is complete in this arena and the spectrum of choices is limitless."

■ Consequently, the trial justice did not in any way limit the use of the prior inconsistent statements solely to diminish the credibility of a witness. This Court, in *State v. Morey*, 722 A.2d 1185, 1191 (R.I. 1999), unequivocally rejected a similar argument with the following comment:

"Certainly Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence has transformed prior inconsistent statement evidence into substantive evidence for a trial jury to consider. However, in this case, nothing said by the trial justice in his instructions to the trial jury violates that rule. Unlike the instruction given in *State v. Pusyka*, 592 A.2d 850 (R.I.1991), and relied upon by the defendant, in this case, the trial justice at no time instructed the trial jury that a previous inconsistent statement made by a trial witness was to be considered only 'as affecting the credibility of that witness' and that the prior inconsistent statement 'is not evidence itself.' *Id.* at 854.

"A fair reading of the instruction given to the trial jury in this case clearly reveals that at no point did the trial justice make or suggest any distinction between substantive and non-substantive evidence and, in fact, during his instructions to the trial jury, he referred to all of the evidence in the trial as being in the nature of substantive evidence."

The principles enunciated by this Court are consistent with opinions from other jurisdictions that similarly hold that a trial judge need not instruct a jury concerning substantive use of a prior inconsistent statement as long as the judge does not

---

1. We issue the caveat that to qualify for postconviction relief in respect to this issue, it will be necessary for defendant to establish that evidence to be presented is newly discovered and was not known, or, in the exercise of reasonable diligence, would not have been known in time to raise the issue fully at trial or in a motion for new trial to have been filed within the time limitation after the rendition of the verdict. *See* G.L.1956 § 10–9.1–1(a)(4); *Danahey v. State*, 118 R.I. 268, 373 A.2d 489 (1977); *State v. Lanoue*, 117 R.I. 342, 366 A.2d 1158 (1976).

limit the use to diminishing credibility. The general view is that unless there is a limiting instruction, jurors will consider all evidence as substantive. *See, e.g., United States v. Marshall,* 935 F.2d 1298, 1301 (D.C.Cir.1991); *State v. Correia,* 33 Conn. App. 457, 636 A.2d 860, 863 (1994); *Commonwealth v. Howard,* 538 Pa. 86, 645 A.2d 1300, 1308 (1994); *Commonwealth v. Blount,* 387 Pa.Super. 603, 564 A.2d 952, 956–57 (1989); *see also* 1 *McCormick on Evidence* § 54 (4th ed. Strong 1992).

It appears that the authority is overwhelming that jurors need not be instructed affirmatively in respect to substantive use of a prior inconsistent statement as long as the trial justice places no limitation on the use of such evidence. No such limitation may be found in the case at bar.

### III

Did the Trial Justice Err in Admitting Evidence that a Portion of the Purchase Price of the Automobile Included a Quantity of Cocaine?

■ The defendant argues that the trial justice abused his discretion by admitting into evidence testimony of DiPina that he had paid defendant the sum of $3,000 and "an eight-ball" of cocaine for the Dodge Neon. The defendant contends that such evidence was prejudicial and should have been inadmissible pursuant to the provisions of Rule 404(b) of the Rhode Island Rules of Evidence.

We are of the opinion that in the case at bar the trial justice did not abuse his discretion in admitting such evidence. We have often stated that Rule 404(b) is designed to prohibit the introduction of evidence that is only relevant to show that the defendant is a bad person and, therefore, likely to have committed the offense with which he is charged. *See State v. Martinez,* 651 A.2d 1189, 1194 (R.I.1994); *State v. Brown,* 626 A.2d 228, 233 (R.I. 1993); *State v. Lemon,* 497 A.2d 713, 721 (R.I.1985); *State v. Acquisto,* 463 A.2d 122, 128 (R.I.1983).

We have conversely held that evidence of the commission of another crime that is relevant to the proof of the crime in issue is not prohibited by Rule 404(b) or by the common law principles that preceded it. *See, e.g., Martinez,* 651 A.2d at 1194; *State v. Woodson,* 551 A.2d 1187, 1191 (R.I. 1988); *Acquisto,* 463 A.2d at 128; *State v. Cline,* 122 R.I. 297, 330–31, 405 A.2d 1192, 1210 (1979).

In the case at bar, the major element in the state's proof was DiPina's purchase of a new 1995 Dodge Neon from defendant. The credibility of DiPina was very much in issue in this case, and any inherently improbable statement made by DiPina could cause the state to fail to meet its burden of proof. Consequently, the indication of a purchase price of $3,000 for a brand new automobile might well have been unpersuasive to the trier of fact. However, adding to that purchase price a quantity of cocaine might well have the effect of showing the transaction in a more credible light. The credibility of this testimony was critical to the state's case.

■ Consequently, this evidence, including the total consideration for the purchase, including the cocaine, was sufficiently relevant to outweigh any prejudice for admissibility when considered under the weighing provision of Rule 403 of the Rhode Island Rules of Evidence.

Moreover, the trial justice gave an immediate cautionary instruction after admitting the evidence relating to the consideration for the purchase of the automobile. He said:

"I just want to interrupt the proceeding for one minute, ladies and gentlemen. I simply tell you that to the extent that Mr. DiPina testified about Mr. Clark's alleged involvement with drugs let me tell you [that] Mr. Clark is not on trial for any drug charges, nor has he been charged with any such offense. Such testimony, to the extent that you decide to consider it at all, is only admissible for the very limited purpose as it

may in your minds relate to the defendant's alleged intent, or plan, or motive with respect to the charge for which he is presently on trial."

At the conclusion of the evidence, the trial justice gave another instruction to the same effect. He said:

"I remind you of what I said during the course of the trial in connection with Mr. DiPina's testimony about Mr. Clark's alleged involvement with drugs. I will tell you again, he's not on trial for his involvement as alleged by Mr. DiPina for drugs. That testimony, to the extent that you decide to consider it, is only admissible, as I told you, for the very limited purpose as it may in your minds relate to the defendant's intent, plan, or motive with respect to the charge for which he is presently on trial."

Taking into account the significant relevance of this evidence in proving an essential element of the state's case together with the very effective limiting instructions given immediately after the receipt of such evidence and in the final instructions of the trial justice, we conclude that the trial justice did not abuse his discretion in admitting such evidence and that the jury may be presumed to have followed his limiting instructions. *See State v. LaRoche*, 683 A.2d 989, 1000 (R.I.1996) ("[w]e have often held that the members of the jury are presumed to follow the trial justice's instructions").

## IV

Did the Trial Justice Abuse His Discretion by Admitting Evidence of a Conversation Between Defendant and DiPina While Both Were in the Maximum Security Section of the ACI?

■ The defendant argues that the trial justice erred and abused his discretion by admitting evidence of a conversation that took place between defendant and DiPina in the maximum security section of the ACI. In that conversation, as related by DiPina, defendant suggested to DiPina that since he was serving time for possession of a stolen automobile, he should "take the weight" for the charge and accept blame for having stolen the automobile himself. The defendant argues that the allusion to his presence in the maximum security section of the ACI was unduly prejudicial and should have been precluded pursuant to Rule 404(b), as well as under the weighing principles set forth in Rule 403.

■ As we pointed out in the preceding section of this opinion, prejudicial evidence relating to other bad conduct is admissible if it is relevant to proof of an important element in the state's case. In this instance, it was highly important to set forth DiPina's motivation to make a statement indicating that he had stolen the automobile in question. This statement constituted a recantation of the information that DiPina had given to the state police, and was contradictory to his testimony at trial. The setting in which this conversation took place was essential in the state's attempt to show the persuasiveness of defendant's suggestion.

DiPina believed defendant to be a person of great influence at the ACI and particularly in its maximum security section. DiPina had testified that when he was in the Intake Center, certain inmates from the maximum security section advised him that he should seek to exonerate defendant. Therefore, a conversation that took place between him and defendant in the maximum security section would be of much greater compelling quality than if such a conversation took place elsewhere or if defendant's testimony was artificially sanitized to eliminate the reference to the maximum security setting. We have said that a defendant has no right to preclude the introduction of relevant truths merely because they may be prejudicial. *See Cline*, 122 R.I. at 330–31, 405 A.2d at 1210.

■ Moreover, the trial justice again gave a cautionary instruction admonishing

the jury that no inference should be drawn against defendant because of his presence in the maximum security section of the ACI.

"As I told you [at] the outset of the trial, the defendant is detained at the ACI for lack of money to post bail. As I told you [earlier in the trial], that circumstance is not at all germane or important to you in your consideration of his guilt or innocence, and it certainly does not diminish in any way his presumption of innocence; nor should you in any way speculate or consider why he may have been placed in various sections of the ACI, whether in Minimum, or Medium, or Maximum areas. As you may know, prison often becomes crowded, indeed, over-crowded. Any prison authorities are simply obliged to make use of whatever space may be available to them at any given time. Accordingly, inmates are frequently moved about within the prison system simply to make use of available space. No prejudice whatsoever against the defendant should be attached merely to the fact of where he might have been located within the ACI while he has been awaiting trial on this charge and was without funds to post bail."

The significant relevance of this evidence together with the cautionary instruction of the trial justice leads us to conclude that the trial justice committed no error and certainly no abuse of discretion in admitting evidence of this conversation together with the setting in which it took place.

V

The Challenge to the Habitual Criminal Statute

The defendant argues that he should not have been subject to the imposition of an enhanced sentence pursuant to the Rhode Island Habitual Criminal Statute, § 12–19–21. This statute in pertinent part provides as follows:

"(a) If any person who has been previously convicted in this or any other state of two or more felony offenses arising from separate and distinct incidents and sentenced on two or more such occasions to serve a term in prison shall, after the convictions and sentences, be convicted in this state of any offense punished by imprisonment for more than one year, such person shall be deemed an 'habitual criminal.' Upon conviction, the person deemed a habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, in addition to any sentence imposed for the offense of which he or she was last convicted."

Section 12–19–21 further provides that, upon a finding that a defendant is an habitual offender, she or he:

"shall be sentenced by the court to an additional consecutive term of imprisonment of not exceeding twenty-five (25) years; and provided further, that the court shall order the defendant to serve a minimum number of years of the sentence before he or she becomes eligible for parole."

■ The defendant challenges the constitutionality of this statute on the ground that it establishes a separate offense and violates the constitutional protection against double jeopardy. This Court has specifically rejected a virtually identical argument set forth in *State v. Tregaskis*, 540 A.2d 1022, 1026 (R.I.1988). There we stated that the enhanced sentencing statute did not create a separate offense and that it did not violate either equal protection or due process under the state or federal constitutions.

"Finally, defendant argues that his presentation as a habitual criminal violates the due-process and equal-protection clauses, article I, section 2, and the proportionality clause, article I, section 8, of the Rhode Island Constitution. At the outset, we note that habitual-offender statutes have long been upheld as

constitutional as long as the status of being a habitual offender is not considered a separate offense. *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *State v. Sitko*, 457 A.2d 260 (R.I.1983).

"In essence, defendant now argues that the state arbitrarily elected to present him as a habitual offender and, in so doing, violated his constitutional rights of due process and equal protection. The Supreme Court in *Bordenkircher* rejected the argument that a prosecutor's decision to proceed under a habitual-offender statute violated the defendant's due-process rights. 434 U.S. at 364, 98 S.Ct. at 668–69, 54 L.Ed.2d at 611. The Court recognized that the ' "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" so long as "the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." ' *Id.* In the absence of such an 'unjustifiable standard' in the instant case, *Bordenkircher* dictates that defendant's equal-protection and due-process claims are without basis. *See also State v. DeMasi*, 420 A.2d 1369 (R.I.1980) (in which we rejected the defendant's argument that decision to charge him as a habitual offender violated equal protection)." *Tregaskis*, 540 A.2d at 1026.

Our holding in *Tregaskis* substantially rebuts nearly all the arguments made by defendant, including his assertion of selective prosecution in respect to this particular defendant. He suggested that this provision has been used to penalize defendants who choose to demand a trial. Moreover, defendant contends that the Department of the Attorney General has exercised its discretion to pursue habitual criminal proceedings only against men. Neither of these contentions has merit.

In *United States v. Armstrong*, 517 U.S. 456, 470, 116 S.Ct. 1480, 1489, 134 L.Ed.2d 687, 702 (1996), the Supreme Court of the United States declined to review prosecutors' decisions in the absence of clear evidence which demonstrated both a discriminatory effect and a discriminatory purpose. To this end it would be necessary to show that similarly situated individuals were not prosecuted under this provision. The defendant has failed to establish that any similarly situated person with a record either identical or comparable to that of defendant, whether male or female, has not been subjected to the enhanced sentence provision of § 12–19–21.

The trial justice in this case, made the following comment about the use of the statute in respect to this defendant.

"I don't know whether or not the State uses the habitual-offender notice as a so-called 'bargaining chip.' I don't have any evidence before me that would so demonstrate it. The allegation you make, at least as I read it in your papers, is that the State seeks to punish those who go to trial with the habitual-offender label and rewards those who dispose of their cases short of trial, and rewards them with the lesser recommendation than they otherwise might make after trial by way of sentencing; awards [*sic*] them, also, by declining to press the habitual-offender category.

"We know, from much of the case law, irrespective of habitual offender allegations, that those who elect to take advantage of their constitutional rights to go to trial occasionally are meted out sentences that are different than what they otherwise might have been had they pled guilty prior to trial. The Court's interpretation is that that is not as much a vindictive punishment to the man or woman who elects to go to trial as it is a reward for the defendant who acknowledges his or her culpability at the outset and begins the trip towards the rehabilitative process. The courts having said that is not impermissible; and, too, at trial, things come out during the course of that evidence, that casts a different light on what a sentence would

appropriately be than might not be disclosed prior to a trial.

"I disagree that the State uses this as a 'punishment chip,' a 'bargaining chip.' I don't have any particular evidence of that before me. And as I said * * * the Statute, 12–19–21, does not oblige the trial court, even though it may designate the defendant as an habitual-offender, to sentence such an offender to the 25–year maximum. I have discretion, depending, again, upon the nature of the individual who stands before the Court and his historical criminal record, as presented, together with whatever other factors generally are involved in the sentencing process.

"In connection with the argument that you make in your memorandum that this is a selective prosecution, I don't see it before me in the papers and exhibits that you have filed. If Mr. Clarke [*sic*] has been somehow unfairly selected, at least in your view, I don't think he's been unfairly selected to be categorized as a habitual-offender; and, in fact, based upon his record, quite to the contrary: He has been quite fairly selected. If anybody, in hindsight at this juncture of the proceedings, deserves to be looked upon as a habitual offender, it is Mr. Clarke [*sic*]."

A recitation of defendant's remarkable record of criminal activities would certainly justify the comment of the trial justice. As earlier indicated, defendant, while serving a sentence at the ACI, was convicted of the second-degree murder of another inmate on November 2, 1974, for which he was initially sentenced to death. That sentence was vacated after the Rhode Island death penalty was declared unconstitutional in *State v. Cline*, 121 R.I. 299, 397 A.2d 1309 (1979). The defendant later was re-sentenced to a term of life imprisonment, and his conviction was affirmed in *State v. Clark*, 423 A.2d 1151 (R.I.1980). Before the stabbing death of a fellow inmate, defendant, on July 9, 1969, raped a young female college student after seizing her in the stairwell to her apartment. He was convicted of this attack and sentenced to fifteen years incarceration at the ACI. His conviction was affirmed in *State v. Clark*, 112 R.I. 270, 275, 308 A.2d 792, 795 (1973). It was while serving this sentence that defendant committed the murder in 1974. The state also presented evidence of other offenses committed by defendant while he was an inmate at the ACI, including escape, possession of drugs, and possession of weapons. The defendant presented no evidence other than his assertion that any similarly situated individual, male or female, was absolved from prosecution under the habitual-offender statute.

In respect to defendant's double jeopardy claim, it has long been established that there is no double jeopardy bar to the use of prior convictions in sentencing an habitual or persistent offender. *See, e.g., Caspari v. Bohlen*, 510 U.S. 383, 391, 114 S.Ct. 948, 954, 127 L.Ed.2d 236, 246 (1994); *Spencer v. Texas*, 385 U.S. 554, 560, 87 S.Ct. 648, 651, 17 L.Ed.2d 606, 611 (1967) and cases cited therein. Consequently, there is no double jeopardy violation in the implementation of the Rhode Island enhanced penalty statute.

Therefore, defendant's contentions concerning the invalidity of the habitual-offender statute and the impropriety of its application to him under the facts of the case at bar must be rejected.

## VI

### Contentions Raised in the *Pro Se* Brief Filed by Sidney Clark

In addition to the brief filed by the Public Defender, defendant filed a forty-page brief in which he raised a number of issues that may be consolidated into a single contention. He asserts that the prosecution's entire case rested solely on the testimony of DiPina, whom he accused of committing perjury throughout the pre-trial stage and during the trial itself. He further contends that the prosecutor knew that DiPina was committing perjury and

did nothing to correct this injustice to defendant. He rejects DiPina's explanation of the reasons that DiPina recanted his initial statements to his own attorney and to the state police.

 The short answer to defendant's contentions is that the jury, and the trial justice, believed DiPina and accepted his explanation that his recantation was based upon fear of defendant and other inmates at the ACI who desired to protect defendant from the charge of possession of a stolen automobile. The belief of the jury and the trial justice concerning the truth of DiPina's trial testimony would tend to negate the asserted fact that the prosecution believed DiPina's testimony at trial to be false.

It should also be noted that the prosecution's case against defendant did not consist solely of DiPina's testimony. Indeed, defendant himself in his brief alludes to the circumstantial evidence that supported the state's case against defendant as a logical suspect to have stolen the Dodge automobile from the Silver City automobile lot. There was very persuasive evidence that the automobile was stolen from a secured fenced lot in which new automobiles were stored. The defendant, as a salesman, would have had access to this lot and could have removed an automobile without being noticed by security personnel. It is true that there was no direct evidence of defendant's having performed this act; but there was circumstantial evidence of the accessibility of this automobile to defendant, while there was utterly no evidence, circumstantial or otherwise, that supported a theory that DiPina could have stolen this automobile from Silver City's secured lot.

Our examination of the defendant's brief and the factual and legal arguments which it contains causes us to conclude that his arguments, both factual and legal, are without merit.

## Conclusion

For the reasons stated, the appeal of the defendant is denied and dismissed. The judgment of conviction and the sentence imposed under the habitual criminal statute are affirmed. The papers in the case may be remanded to the Superior Court.

Justice BOURCIER did not participate.